## 28799. KINGMAN DISTRIBUTING COMPANY v. DAVIS.

DECIDED APRIL 3, 1941.

*Nottingham & Nottingham,* for plaintiff.
*Edward F. Taylor, Sidney W. Hatcher,* for defendant.

STEPHENS, P. J. Carey L. Davis brought suit against Kingman Distributing Company, to recover for alleged breach of an executory contract by which the plaintiff was to transport a certain quantity of apple cider from Martinsburg, West Virginia, to the defendant in Macon. It was alleged that the defendant had breached the contract by refusing to permit the plaintiff to transport a certain portion of the cider, to the plaintiff's damage in an alleged amount. The defendant denied liability under the contract, and alleged that the plaintiff did not have a permit or certificate from the Interstate Commerce Commission authorizing him to engage in interstate transportation of property, as required by the laws of the United States. It appears without dispute from the evidence that at the time of the execution of the contract, and

at the time of its alleged breach, there had not been issued to the plaintiff the permit required of a person engaged in transportation in interstate commerce. It appears that the plaintiff, after having executed the contract, transported from West Virginia to Macon a portion of the cider without having obtained the required permit, and that the defendant had paid him the transportation charges therefor. The plaintiff testified that when he entered into the contract the defendant promised that he would, if a Federal permit were required, procure the permit. This the defendant denied. The evidence is in conflict as to the agreement with respect to the quantity of cider to be transported. It appears from the evidence that the defendant refused to go on with the contract after the plaintiff had transported a portion of the cider which the plaintiff claims under the contract he was entitled to haul. The plaintiff testified that he was ready, able, and willing to comply with the contract, and demanded that he be permitted to haul the entire quantity of cider or be paid the loss sustained by reason of the breach, and that the defendant refused to do either. There was evidence tending to show the amount of the plaintiff's alleged damage.

The jury returned a verdict of $722 in favor of the plaintiff. The defendant moved for a new trial on general and special grounds, contending that the verdict was contrary to law and without evidence to support it, that the contract was invalid and unenforceable as it appeared conclusively from the evidence that the plaintiff had not obtained the permit from the Interstate Commerce Commission as required by the motor-carrier's act, and that on this ground the verdict was unauthorized. The court overruled the motion, and the defendant excepted.

If the plaintiff falls within any definition of a carrier by motor vehicle in interstate commerce as defined in the Federal motor-carrier's act of 1935 (49 U. S. C. A. Cum. Supp. 1940, p. 76), he is a "contract carrier." The term "contract carrier by motor vehicle" is defined in section 203 (15) of the act as being "any person, not included under paragraph 14 of this act, who or which under special and individual contracts or agreements, and whether directly or by lease or any other arrangement, transports passengers or property in interstate or foreign commerce by motor vehicle for compensation." Section 209 provides that "no person shall

engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway . . unless there is in force with respect to such carrier a permit issued by the commission, authorizing such person to engage in such business." It will be observed that a "contract carrier" is any person who by lease or any other arrangement *transports* passengers or property "in interstate or foreign commerce by motor vehicle," and that the permit is to be issued to the contract carrier, as provided by the act, and no person shall engage in the business of a contract carrier by motor vehicle in interstate commerce "on any *public highway*" unless there is in force "with respect to such carrier a permit issued by the commission, authorizing such person to engage in such business." A contract carrier as defined in this act is therefore not a person who merely makes contracts for the purpose of transportation by motor carrier in interstate commerce, but is a person who "*transports* passengers or property in interstate or foreign commerce by motor vehicle," and the permit required is to be issued to such carrier who is engaged in the business of a contract carrier by motor vehicle on any "public highway." As provided by this act, as respects doing business without the permit required, it is only unlawful for a contract carrier to engage in interstate commerce on a "public highway" in the "transportation" by motor carrier, where there is not in force at the time with respect to such carrier a *permit* by the commission authorizing the carrier to engage in such business, which, as defined by the act, is the business of transporting passengers or property in interstate or foreign commerce under some contractual arrangement.

It follows that for the mere making of a contract between a person as a motor contract carrier and another, for the purpose of transportation of property of the latter in interstate commerce, no permit is required to be issued by the commission; and that the mere making of an executory contract, by which one of the parties agrees to transport in interstate commerce property belonging to another, is not void or illegal on the ground that no permit, as required by section 209 of the motor-carriers act, has been issued by the commission. Therefore, in a suit by the party engaging to transport in interstate commerce property of the other contracting party against the latter to recover damages for a breach of the executory contract by reason of failure to permit the plaintiff to

perform and transport in interstate commerce the goods contracted for, it is no defense that the contract sued on was void and unenforceable by reason of there not having been issued, before the execution of the contract, a permit from the interstate commerce commission as required in section 209 of the act.

The fact that the contract may have been partially completed by the actual transportation in interstate commerce on the public highway of a portion of the property contracted for without the required permit having been obtained, can have no effect on the legality of the contract as an executory contract entered into by the parties for the transportation in interstate commerce of property belonging to one of the parties, where this contract was made and executed without there having been obtained the permit required under section 209 of the act.

The evidence did not demand a verdict for the defendant on the ground that the contract sued on was illegal and unenforceable. The evidence authorized the verdict for the plaintiff, and the court did not err in overruling the defendant's motion for new trial.

*Judgment affirmed. Felton, J., concurs.*

SUTTON, J., dissenting. Carey L. Davis brought suit against Kingman Distributing Company, alleging that he had an oral contract with the defendant whereby he was to transport by motor truck a certain quantity of apple cider from Martinsburg, West Virginia, to the defendant at Macon, Georgia, for which service the defendant agreed to pay him 55 cents per hundred pounds, and that after he had transported a certain portion of the cider the defendant cancelled the contract. Judgment was prayed for $5202.71 as the amount of damages sustained by him because of the alleged breach by the defendant. The defendant filed answer denying substantially all of the allegations of the petition, and by amendment set up that the plaintiff did not have any permit or certificate from the Interstate Commerce Commission authorizing him to engage in interstate transportation of property for hire as required by the laws of the United States.

On the trial of the case the evidence showed conclusively that the plaintiff did not have such permit. He testified, however, that at the time of entering into the contract for hauling the defendant promised that he would, if a permit were necessary, procure the requisite permit for the plaintiff. This the defendant denied.

The evidence also made a conflict as to the alleged agreement with respect to any certain quantity of cider to be transported. The plaintiff claimed that the defendant's only excuse for stopping the hauling was that the product was moving slowly on sales and that it could not handle it profitably; that he, the plaintiff, was ready, able, and willing to comply with the contract and demanded that he be permitted to haul the entire quantity of cider contracted to be hauled or be paid the loss sustained by him because of the defendant's breach, but that the defendant refused to do either. For such hauling as was done prior to the alleged breach the plaintiff admitted that full payment had been made. He testified as to facts tending to support his contention as to his damage by reason of not being permitted to haul the entire quantity of cider contemplated by the alleged contract.

The jury returned a verdict for $722 in favor of the plaintiff. The defendant filed a motion for new trial on the general grounds, and by amendment added two special grounds to the effect that the alleged agreement to haul the cider was invalid and unenforceable inasmuch as the evidence conclusively showed that the plaintiff had not obtained a permit from the Interstate Commerce Commission, as required by law, for the transportation of the cider and that, therefore, the verdict was unauthorized. The court overruled the motion for new trial, and the exception here is to that judgment.

The Interstate Commerce act of 1887 was, by an act of Congress, approved August 9, 1935, known as the "Motor Carriers Act," amended so as to confer jurisdiction on the Interstate Commerce Commission with respect to interstate transportation of passengers or property by motor carriers. 49 U. S. Stat. at Large, p. 543 et seq. This act as subsequently amended in a few respects is codified in chapter 8, p. 76 et seq., in the Cumulative Annual Pocket Part (1940) to U. S. C. A., title 49, § 16 to end, and provides in part as follows:

"§ 302. (a) It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor,

without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and co-ordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and co-operate with the several States and the duly-authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this chapter.  (b)  The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is hereby vested in the Interstate Commerce Commission."

"§ 303.  (a)  .  .  (6)  The term 'permit' means a permit issued under this chapter to contract carriers by motor vehicle. .  .  (15)  The term 'contract carrier by motor vehicle' means any person, not included under paragraph (14) of this section [relating to common carrier by motor vehicle], who or which, under special and individual contracts or agreements, and whether directly or by a lease or any other arrangement, transports passengers or property in interstate or foreign commerce by motor vehicle for compensation.  (16)  The term 'motor carrier' includes both a common carrier by motor vehicle and a contract carrier by motor vehicle."

"§ 304.  (a)  It shall be the duty of the commission  .  .  (2) To regulate contract carriers by motor vehicle as provided in this chapter, and to that end the commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.  (3)  To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment.  In the event such requirements are established, the term 'motor carrier' shall be construed to include private carriers of property by motor vehicle in the administration of sections 304

(d) and (e), 305, 320, 321, 322 (a), (b), (d), (f), and (g), and 324 of this chapter."

"§ 309.    (a)    Except as otherwise provided in this section and in section 310a, no person shall engage in the business of a contract carrier by motor vehicle in interstate or foreign commerce on any public highway or within any reservation under the exclusive jurisdiction of the United States unless there is in force with respect to such carrier a permit issued by the commission, authorizing such person to engage in such business: Provided, [certain exceptions not applicable to the present case.]    (b)    Application for such permits shall be made to the commission in writing, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the commission may, by regulations, require.    Subject to section 310 [providing that after January 1, 1936, no person shall at the same time hold a certificate as a common carrier and a permit as a contract carrier unless, for good cause shown, the commission may approve], a permit shall be issued to any qualified applicant therefor authorizing in whole or in part the operations covered by the application, if it appears from the application or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this chapter and the lawful requirements, rules, and regulations of the commission thereunder, and that the proposed operation, to the extent authorized by the permit, will be consistent with the public interest and the policy declared in section 302 (a) of this chapter; otherwise such application shall be denied.    The commission shall specify in the permit the business of the contract carrier covered thereby and the scope thereof and shall attach to it, at the time of issuance, and from time to time thereafter, such reasonable terms, conditions, and limitations consistent with the character of the holder as a contract carrier as are necessary to carry out, with respect to the operations of such carrier, the requirements established by the commission under section 304 (a) (2) and (6) [as to the regulation of such contract carriers]: Provided, however, That no terms, conditions, or limitations shall restrict the right of the carrier to substitute or add contracts within the scope of the permit, or to add to his or its equipment and facilities, within

the scope of the permit, as the development of the business and the demands of the public may require."

"§ 315. No certificate or permit shall be issued to a motor carrier or remain in force, unless such carrier complies with such reasonable rules and regulations as the commission shall prescribe governing the filing and approval of surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, in such reasonable amount as the commission may require, conditioned to pay, within the amount of such surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles under such certificate or permit, or for loss or damage to property of others."

"§ 318 (a). It shall be the duty of every contract carrier by motor vehicle to file with the commission, publish, and keep open for public inspection, in the form and manner prescribed by the commission, schedules or, in the discretion of the commission, copies of contracts containing the minimum charges of such carrier for the transportation of passengers or property in interstate or foreign commerce, and any rule, regulation, or practice affecting such charges and the value of the service thereunder. No such contract carrier, unless otherwise provided by this chapter, shall engage in the transportation of passengers or property in interstate or foreign commerce unless the minimum charges for such transportation by said carrier have been published, filed, and posted in accordance with the provisions of this chapter. . ."

"§ 322. Any person knowingly and wilfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense."

The plain provisions of the act above quoted make unnecessary any demonstration that it was not enacted as a revenue measure, but for the obvious purpose of protecting the public against unfit

and irresponsible motor carriers of passengers or property, giving to the Interstate Commerce Commission full authority and supervision to govern such interstate hauling on the public highways; that the term "motor carrier" includes a contract carrier as well as a common carrier, and that before entering into such an enterprise it is necessary that the person transporting such interstate goods obtain a permit from the Interstate Commerce Commission and comply with certain enumerated requirements. It further provides that the interstate transportation of property without a permit shall subject the offender to punishment as for a misdemeanor. In *Southern Flour & Grain Co.* v. *Smith*, 31 *Ga. App.* 52, 53 (120 S. E. 36), it was said: "Where the terms of a contract directly involve the infraction of a civil statute not enacted for the purpose of raising revenue, and such infraction is penalized by a fine, or imprisonment, or both, the contract is void and unenforceable. *Conley* v. *Sims*, 71 *Ga.* 161; Civil Code (1910), § 4251 [Code of 1933. § 20-501]. For the case of a statute enacted for the purpose of raising revenue, see *Toole* v. *Wiregrass Development Co.*, 142 *Ga.* 57 (82 S. E. 514)." In *McLamb* v. *Phillips*, 34 *Ga. App.* 210 (129 S. E. 570), it was ruled: "While statutes imposing license taxes and providing for their collection, when designed merely to raise revenue, as in the license of real-estate agents, do not impliedly nullify contracts made in contravention of their provisions (*Toole* v. *Wiregrass Development Co.*, 142 *Ga.* 57, 60-63); the general rule of law is that where the license required by the statute is not imposed only for revenue purposes, but requires registration or licensing primarily for the purpose of protecting the public from acts *mala in se*, or detrimental to good morals, or from improper, incompetent, or irresponsible persons, as in the case of unregistered or unlicensed druggists or physicians, their imposition amounts to a positive prohibition of a contract made without a compliance with and in violation of the statute, and by implication renders such a contract void and unenforceable." (Citing.) In *Pratt* v. *Sloan*, 41 *Ga. App.* 150, 153 (152 S. E. 275), it was said: "It is the rule in this State, that, where a statute provides that persons proposing to engage in a certain business shall procure a license before being authorized to do so, and where it appears from the terms of the statute that it was enacted not merely as a revenue measure but was intended as a regulation of such business in the

interest of the public, contracts made in violation of such statute are void and unenforceable." See also *Raleigh & Gaston R. Co.* v. *Swanson*, 102 *Ga.* 754 (28 S. E. 601, 39 L. R. A. 275); *Murray* v. *Williams*, 121 *Ga.* 63 (48 S. E. 686); *Lee* v. *Moseley*, 40 *Ga. App.* 371 (149 S. E. 808); *Meinhard* v. *Stillwell Realty Co.*, 47 *Ga. App.* 194 (169 S. E. 732).

Under the above authorities, and the plaintiff in the present case not having obtained a permit, the alleged contract for the interstate transportation of cider was void and unenforceable, and, therefore, the verdict in favor of the plaintiff was not authorized.

It is urged by the defendant in error that he relied on the promise of the defendant that a permit would, if necessary to the legality of the transaction, be obtained for him. In trusting to the defendant in the respect claimed the plaintiff did so at the peril of violating the express provision of the motor-carriers act, and the failure of the person relied upon to obtain the requisite permit can not excuse the dereliction of the plaintiff. If a person is to be exonerated for the reason here urged, the requirement of the act, that a permit be first obtained for the interstate transportation of goods by motor truck, would be set at naught and punishment be averted by a showing that the offender had trusted to another who was not amenable to the statute.

Nor do I think tenable the contention of the defendant in error that, as the act does not *expressly* declare unlawful the failure to obtain a permit, the contract can not be said to be unenforceable, and that the punitive feature of the act applies only to the person of the carrier and does not affect his contract. As was said in *Murray* v. *Williams*, supra: "These sections of the Code are intended to protect the public against incompetent and unqualified practitioners of medicine, and not for raising revenue, and are, therefore, prohibitory. One who practices medicine without having registered as the Code requires can not recover for his services. Clark on Contracts (2d ed.), § 153. 'Even where there is no express provision that the contract for remuneration for services rendered by an unlicensed physician shall be void, still *if the statute imposes a penalty for practicing without having obtained a license, or without having complied with other statutory provisions, the courts will apply the prohibition,* and a recovery can not be had for professional services rendered.' 22 Am. & Eng. Enc. L.

795. See, in this connection, *Conley* v. *Sims,* 71 *Ga.* 161, and cit." (Italics ours.) See also *Padgett* v. *Silver Lake Corporation,* 168 *Ga.* 759, 761 (149 S. E. 180).

No recovery being permissible under the void and unenforceable contract, the court erred in overruling the defendant's motion for new trial.

*Southern Flour & Grain Co.* v. *Pillsbury Flour Mills Co.,* 29 *Ga. App.* 671 (116 S. E. 910), cited and largely relied on by the defendant in error is not applicable. There the defendant bought certain low grade flour from the plaintiff at prices f. o. b. Atlanta, Georgia. The plaintiff, in order to obtain a lower rate than was properly applicable, according to the defendant, shipped the goods as "wheat feed," in direct violation of the interstate commerce act. The rate at which the goods were shipped was something in which the consignee was not concerned, inasmuch as the freight charges were to be borne by the shipper, and the contract was one exclusively for the purchase of goods. In Merchants Cotton Press &c. Co. *v.* Insurance Co., 151 U. S. 368, cited in the *Southern Flour & Grain Co.* case, holding that "The false billing of goods in order to obtain a lower freight rate than that actually carried by the goods shipped, though expressly made a misdemeanor by the interstate-commerce act, does not vitiate *a contract of sale* entered into between the person so violating the act and a third person" (italics ours), it was said: "Jones Brothers & Company [the shippers] were either the agents of the owners or consignees of the cotton, or the sellers thereof to eastern consignees, and the rebates or drawbacks, which they claimed to have been allowed, if allowed at all, according to the testimony of one of the members of the firm, was a private benefit which the firm secured, and, so far as appears, without the knowledge or consent of the owners or consignees of the cotton. Under such circumstances, if such rebates were paid or allowed to the firm by the agent of the railroad company, it is difficult to understand upon what principle such an allowance would vitiate or render void the bills of lading which the railroad company issued to the owners of the cotton. It is still more difficult to understand how the compress company, or the fire-insurance companies, could avail themselves of the arrangement, even regarding it as illegal, between the agent of the railroad company and Jones Brothers & Company. They were not parties to it, and

they were not affected by it in any way, shape, or form. There is nothing in the interstate commerce law which vitiates bills of lading, or which, by reason of such allowance to Jones Brothers & Company, if actually made, would invalidate the contract of affreightment or exempt the railroad company from liability on its bills of lading." The present case is not one, as in *Southern Flour & Grain Co.,* supra, involving the *purchase of goods,* a contract in connection with which was not prohibited by the interstate commerce act, but was one in which the plaintiff was directly involved in the violation of a Federal statute relating to the *transportation* of goods by motor truck in interstate commerce and which rendered the contract entered into void and unenforceable.

For the reasons above given I do not think that the plaintiff was entitled to recover, and I dissent from the judgment of affirmance.